## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 01 2018, 10:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joseph A. Sobek
Reed, Earhart & Lennox, LLC
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Indiana Attorney General

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mark H. Soto,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 1, 2018

Court of Appeals Case No.
43A04-1710-CR-2388

Appeal from the Kosciusko Circuit Court

The Honorable Stephen R. Bowers, Special Judge

Trial Court Cause No.
43C01-1602-F5-146

**Shepard, Senior Judge.**

[1]     Mark H. Soto joined with Kevin Bronson, a self-proclaimed gang member, in an ongoing enterprise to coerce money from others through threats of gang violence. Among these, Soto told James McLaurin that if he did not comply

with their demands, McLaurin and his wife and children would be tortured and murdered by a biker gang. Soto appeals his convictions of two counts of corrupt business influence, both Level 5 felonies,[1] and one count of intimidation, a Class D felony.[2] We affirm.

[2] Soto was a pastor and a professor at a private Christian university. Bronson was a career criminal and a self-proclaimed member of the Aryan Brotherhood, a prison-based gang. The two met in 1998, and Soto became Bronson's mentor. Soto and Bronson continued their relationship during Bronson's periodic incarcerations, including a stint in the Kosciusko County Jail from 2010 to 2012. Bronson claimed to have become a devout Christian, and Soto convinced the jailers to give Bronson special treatment, including a phone in his cell. Soto provided credibility in Bronson's dealings with others due to his "impeccable" reputation as a pastor and educator. Tr. Vol. 4, pp. 89, 153.

[3] Bronson had planned to make a movie about his life since at least 2008, and he claimed that the Brotherhood would release him from membership if the movie depicted that group in a terrifying light. Bronson also needed assistance with living expenses when he was not incarcerated. He told Soto that he would give Soto part of the proceeds from the film in exchange for helping him. Further, Bronson would establish a nonprofit organization for ministry purposes, which

---

[1] Ind. Code § 35-45-6-2 (2014).

[2] Ind. Code § 35-45-2-1 (2013).

Soto would run.  Finally, Bronson had introduced Soto to his wealthy father, from whom he expected to receive a large inheritance.  Bronson named Soto as a beneficiary in his will.

[4]  Acting on Bronson's behalf, Soto reached out to several individuals for help with the movie and funding Bronson's living expenses.  Among others, he contacted attorney David Baker and pastor James McLaurin.  Bronson met separately with both men, in Soto's presence.  During initial meetings, Bronson told Baker and McLaurin that he was a member of the Brotherhood and would be free only if he made a movie demonstrating how "bad the brotherhood was." Tr. Vol. 3, p. 122.  The movie would also depict Bronson's purported attempts to redeem himself.  In later, separate meetings with Baker and McLaurin, Bronson told each of them in Soto's presence that the Brotherhood was a violent gang, wanted the movie completed, and would torture and murder Baker, McLaurin, and their wives and children if they did not cooperate.

[5]  Soto separately made threats to Baker and McLaurin.  After the initial meeting involving Bronson, Baker, and Soto, Soto told Baker that the Brotherhood supported "this story being told" and that they would "have to see it through [to] fruition." *Id.* at 118-19.  Soto told McLaurin that, because he knew about Bronson's situation, he was "in threat" as well. *Id.*  Soto made it clear McLaurin was now on the "radar of the Aryan Brotherhood." *Id.* at 44.  Both men believed the threats and were fearful.  Soto and Bronson eventually introduced Baker to McLaurin.

[6] Baker incorporated a business entity, Young Dragon Enterprises, LLC, to manage negotiations with film companies. Bronson had a fifty percent interest in the LLC, while Soto owned thirty percent and McLaurin owned twenty percent. Bronson and Soto opened two bank accounts for Young Dragon, a capital account and a corporate account. Soto had access to both accounts, and Bronson had access to the corporate account. McLaurin made deposits in the capital account and tracked the movement of funds to the corporate account.

[7] McLaurin asked his friend Tyler Silveus to help pay for the project and Bronson's living expenses. McLaurin also provided his own personal funds under threat. From September through December 2012, McLaurin wrote personal checks totaling over six thousand dollars to Soto, allegedly for Bronson's benefit. Soto personally picked up each check from McLaurin.

[8] McLaurin was unhappy at the rate money was being withdrawn from Young Dragon's accounts, and at one point he refused to locate additional money until he, Bronson, Soto, and Baker met to discuss "accountability and rules of engagement." Tr. Vol. 2, p. 220. Soto arranged such a meeting on December 17, 2012, at a church in Van Wert, Ohio. Soto told McLaurin and Baker that fourteen bikers were in the area and were ready to act against McLaurin and Baker if they were not "in full compliance with where they wanted to go." *Id.* at 221. Baker understood Soto to mean that he "wouldn't make it home" if he and McLaurin did not comply. Tr. Vol. 3, p. 149. After the meeting, McLaurin and Baker were afraid and talked on their phones as they drove home to ensure each arrived safely.

[9] Bronson continued to threaten Baker and McLaurin's families with torture and murder by the Brotherhood if progress was not made. Soto and Bronson separately told Baker and McLaurin that "Sky Blue" was the leader of the Brotherhood. Tr. Vol. 2, p. 227; Tr. Vol. 3, p. 125. They also told Baker and McLaurin that their communications were being monitored by the Brotherhood. Bronson further told McLaurin the Brotherhood was watching his house "at all times." Tr. Vol. 2, p. 232.

[10] Soto also continued to threaten Baker in a series of emails. For example, in a February 4, 2013 email, Soto told Baker it was "imperative that we show some progress" because "demands are now being made on us to get them finished . . . PLEASE do this so we all do not have to deal with the consequences . . ." Tr. Vol. 8, State's Ex. 28.

[11] Baker understood that Soto's reference to "consequences" was related to Bronson's repeated claims that the Brotherhood would kill Baker's family. Throughout his years-long association with Bronson and Soto, Baker perceived the threats as directed at himself and McLaurin, never Soto. In addition, Soto told Baker about his communications with Brotherhood leadership, leaving an impression that he had a good relationship with them.

[12] Eventually, McLaurin was so exasperated that he texted Bronson, demanding to speak with Sky Blue. In response, Soto and Bronson called McLaurin on the night of January 2, 2013. Soto told McLaurin he "had crossed a line and that I had messed up and that bikers were coming from Fort Wayne to take action on

my family." Tr. Vol. 2, p. 229. Bronson was shouting in the background that the bikers were going to kill them all. McLaurin understood Soto and Bronson as indicating "that my family would die in my presence as I watched, and they would end with me." *Id.* at 230. Soto said the bikers would arrive at McLaurin's house at 3 a.m.

[13] McLaurin called Tyler Silveus, who came over and picked up McLaurin's wife and children. McLaurin stayed at his house to confront the bikers, but no one arrived. Bronson told McLaurin the bikers had seen McLaurin's family leave the house and were "impressed" that he did not call the police. *Id.* at 234.

[14] Eventually, McLaurin and Baker both ended their involvement with Soto and Bronson despite their fears of retribution, forcing Soto and Bronson to turn to other individuals for financial support. Bronson spoke with Silveus and told him the Brotherhood was monitoring his cell phone. Silveus was afraid for himself and his family because Bronson had told him that he would be killed if the movie project failed, and "if anything happened to [Bronson] it would [also] happen to me and my family." Tr. Vol. 5, p. 114. Silveus believed that even if the Brotherhood was not involved, he'd "been around [Bronson] enough to be concerned about him, in particular, and if pushed to a corner what could he be capable of." *Id.* at 113. From September 2012 through February 2013 Silveus wrote several checks to Mark Soto totaling $15,010. One of the checks stated the money was for Soto to purchase cabinets to renovate his kitchen. In all, Silveus paid out over $140,000 to Young Dragon and Soto. Others paid lesser amounts to Young Dragon.

Bronson was arrested on unrelated charges in December 2014, and the police were eventually informed of Soto and Bronson's scheme. The State charged Soto with three counts of corrupt business influence, all Class C felonies/Level 5 felonies, and three counts of intimidation, one as a Class D felony/Level 6 felony, and the other two as Class D felonies. A jury determined Soto was guilty of two of the counts of corrupt business influence and one count of intimidation but found him not guilty of the remaining charges. The trial court imposed a sentence, including ordering Soto to pay restitution as follows:

| Christian McCray | $9,119.57 |
| Derek Hobbs | $5,000 |
| Tyler Silveus | $143,578.32 |
| Cory Greene | $3,150 |

# I. Inconsistent Verdicts

Soto first argues his three convictions should be reversed because they are factually inconsistent with his not guilty verdicts on other counts. The Indiana Supreme Court has stated, "Jury verdicts in criminal cases are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable." *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). Soto claims the facts of this case are distinguishable from the facts in *Beattie*, but we are not free to disregard the Supreme Court's directive.

# II. Sufficiency of the Evidence

[17] When reviewing the sufficiency of the evidence, we consider only probative evidence in the light most favorable to the trial court's judgment. *Burns v. State*, 91 N.E.3d 635 (Ind. 2018). We do not assess the credibility of the witnesses or reweigh the evidence. *Id.* Reversal is appropriate only when no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[18] To obtain a conviction against Soto for Count I, corrupt business influence as a Level 5 felony, the State was required to prove beyond a reasonable doubt that Soto and Bronson knowingly or intentionally received money from individuals, which was derived from their pattern of acts of intimidation against those individuals, and that Soto and Bronson invested the proceeds in Young Dragon Enterprises, LLC. *See* Ind. Code § 35-45-6-2. Further, to obtain a conviction against Soto for Count III, a second charge of corrupt business influence as a Level 5 felony, the State was required to prove beyond a reasonable doubt that Soto and Bronson knowingly or intentionally conducted the business of Young Dragon Enterprises, LLC, through a pattern of racketeering activity, specifically acts of intimidation. *Id.*

[19] The evidence at trial did establish that Soto and Bronson collaborated to coerce their victims to provide services and money. Soto and Bronson's goals were twofold: to make a movie about Bronson's life, and to provide money for themselves. The two repeatedly made direct and indirect threats to their

victims that the Brotherhood would torture and murder their families. They forced Baker to incorporate Young Dragon, which was the entity that received most of the money they coerced from Silveus and others. Soto had the authority to withdraw money from Young Dragon's accounts. Further, Soto also received funds directly from McLaurin, Silveus, and others. He used some of the money to renovate his kitchen.

[20] This is sufficient evidence to prove the two separate counts of corrupt business influence. Soto argues there was no "pattern" of intimidation against the victims, and that all acts of intimidation were committed by Bronson. These arguments are a request to reweigh the evidence.

[21] To obtain a conviction against Soto for Count V, intimidation as a Class D felony, the State was required to prove beyond a reasonable doubt that Soto communicated a threat to McLaurin with the intent that he be placed in fear of retaliation for asking to contact Bronson's alleged superior in the Brotherhood, causing McLaurin to engage in conduct against his will, specifically, sending his family from their home in the middle of the night and remaining awake to await possible attack on him and his family. *See* Ind. Code § 35-45-2-1.

[22] The facts set forth above establish that after McLaurin demanded to talk with "Sky Blue," Soto and Bronson called him on the night of January 2, 2013. While Bronson screamed in the background, Soto told McLaurin he "had crossed a line and that I had messed up and that bikers were coming from Fort Wayne to take action on my family." Tr. Vol. 2, p. 229. Soto's threat caused

McLaurin to send his wife and children away while he stayed behind to confront any assailants. This is sufficient evidence to establish the elements of intimidation beyond a reasonable doubt. Soto argues there is insufficient evidence that he was one of the persons who called McLaurin, and he further claims he was also being threatened by Bronson. These arguments are requests to reweigh the evidence.

## III. Restitution

[23] For his final claim, Soto argues the trial court deprived him of due process in awarding restitution. An order of restitution is a matter within the court's sound discretion and will be reversed only on a showing of abuse of discretion. *Archer v. State*, 81 N.E.3d 212 (Ind. 2017). Due process requires reasonable notice, an opportunity for a fair hearing, and a right to have a court of competent jurisdiction decide the case. *McCallip v. State*, 580 N.E.2d 278 (Ind. Ct. App. 1991).

[24] Soto claims the restitution order was unfair because the State did not present any evidence at sentencing to support its request for restitution. At trial, the State submitted ample, specific evidence of the amounts paid by the victims, including copies of checks. These documents were apparently provided to Soto in discovery prior to trial. We cannot conclude Soto was deprived of reasonable notice of the amount of damages.

[25] Soto next argues the trial court deprived him of due process by ordering him to pay restitution to Silveus because the jury determined he was not guilty of

intimidating Silveus. In addition, he claims Silveus conceded at trial that not all of his payments to Young Dragon and Soto were driven by fear. In effect, Soto wishes to contest what parts of the restitution to Silveus rest on his conviction under Count I as opposed to Counts III or V. This seems likely to be a repackaging of his argument about inconsistent verdicts, but if not, Soto has not supplied argument about the distribution of restitution between counts.

[26] Finally, Soto claims the court failed to consider whether he could afford restitution. An inquiry into ability to pay is required by due process if restitution is a condition of probation. *M.L. v. State*, 838 N.E.2d 525 (Ind. Ct. App. 2005), *trans. denied*. The court explained to Soto his ability to pay would "be determined in conjunction with [the] probation department" and would be addressed in a "further hearing at a later date." Tr. Vol. 6, p. 210. The court did not abuse its discretion by deferring inquiry into Soto's ability to pay.

[27] For the reasons stated above, we affirm the judgment of the trial court.

[28] Affirmed.

Riley, J., and Altice, J., concur.